PRESENT: All the Justices

BRYANT McCANTS

v. Record No. 230115

CD & PB ENTERPRISES, LLC, D/B/A
MAACO, ET AL.

OPINION BY
JUSTICE D. ARTHUR KELSEY
FEBRUARY 15, 2024

FROM THE COURT OF APPEALS OF VIRGINIA

A jury found CD & PB Enterprises, LLC, a vehicle repair shop, and one of its part-owners liable for the conversion of a motor vehicle owned by Bryant McCants. The Court of Appeals vacated the verdict, finding that the Virginia Abandoned Vehicle Act, Code §§ 46.2-1200 to -1207, shielded the defendants from liability. We disagree, reverse the judgment of the Court of Appeals, and reinstate the jury's verdict.

I.

When reviewing on appeal evidence submitted at trial, appellate courts "consider all facts in the light most favorable" to the party that prevailed in the trial court. *Bank of Hampton Rds. v. Powell*, 292 Va. 10, 15 (2016). The party who successfully persuades the factfinder "is entitled [on appeal] to have the evidence viewed in the light most favorable to her, with all conflicts and inferences resolved in her favor." *Chacey v. Garvey*, 291 Va. 1, 8 (2015). In addition, "'an appellate court must consider all the evidence admitted at trial that is contained in the record' and not limit itself to 'merely the evidence that the reviewing court considers most trustworthy.'" *Bowman v. Commonwealth*, 290 Va. 492, 494 n.1 (2015) (citations omitted). Viewing the facts through this evidentiary prism, we retell the story of this conflict.

In January 2017, Bryant McCants arranged for one of his collectible vehicles, a 1970 Ford Mustang Mach 1, to be delivered to a repair shop operated by CD & PB Enterprises, LLC,

doing business as Maaco Collision Repair & Auto Painting ("CD & PB Maaco").[1]  Hanson

Butler, a part owner and employee of CD & PB Maaco, managed the repair shop.  McCants

entered into a contract with CD & PB Maaco pursuant to a "Repair Order" that identified Butler

as the shop "Estimator."  2 J.A. at 565.  In their pleadings, the parties admitted that "[a]t all times

relevant, [McCants] was conducting business" with CD & PB Maaco.  *See* 1 *id.* at 2, 13.  They

also agreed "that [McCants] was dealing with and contracting with [CD & PB Maaco] at all

times and was not engaged in a direct business dealing with any of the ownership of Maaco."  *Id.*

at 3; *see also id.* at 13.  This business relationship was not new to either party.  CD & PB Maaco

had previously performed repair work on at least six cars for McCants, including a previous paint

job for the Mustang.

The Repair Order did not specify a date for the work to be completed but did provide that

McCants would be charged a $35 daily "[s]torage" fee beginning seven days after the work had

been completed.  2 *id.* at 565.  As Butler explained at trial, "[o]nce the vehicle is complete, the

customer has seven days to come pick it up or storage occurs."  *Id.* at 849.  It was CD & PB

Maaco's "practice" to charge such fees on the customer's invoice.  *Id.* at 914-15.  In June 2017,

about five months after the Mustang was initially delivered, Butler notified McCants that the

work was complete.  Using his telephone, McCants paid the bill electronically and flew in from

New York to inspect the vehicle.  McCants was unsatisfied with the work when he inspected it,

and Butler agreed to repaint it.

About 30 days later, Butler called McCants and asked McCants to come inspect the

vehicle because Butler had "forgot[ten] what it was that [McCants] wanted him to do."  1 *id.* at

---

[1] The contractual "Repair Order[s]" represented that CD & PB Maaco was "[l]icensed by
Maaco Franchising, Inc." and was "privately owned and operated."  *See* 2 J.A. at 562-69.

222. Between August 21 and September 25, 2017, Butler and McCants exchanged several text messages about the vehicle. On August 21, Butler texted McCants, "Yo." 2 *id.* at 571. McCants replied, "What's up? Mustangs ready?" *Id.* Butler did not reply. He texted McCants the next day, "Yo again." *Id.* McCants replied that he would "be there" on Saturday morning. *Id.* On August 28, McCants notified Butler that he had been unable to come because his mother was in the hospital, and he apologized for the delay. On August 30, Butler texted McCants, "Hey." *Id.* at 572. McCants responded that he was still at the hospital with his mother and would call him later. Butler replied, "Oh man sorry. Ok." *Id.*

On September 8, Butler texted McCants, "Hello." *Id.* at 573. There was no reply, and Butler texted McCants again on September 20, "U alive?" *Id.* at 574. On September 25, McCants replied that he had been out of the country. Butler responded, "Ok. Now what do I have to do to get you to get this car?" *Id.* at 573. McCants testified that Butler had used similar verbiage in the past to ask McCants if he would accept a discount in exchange for Butler not having to redo unsatisfactory work. *See* 1 *id.* at 237-39. According to McCants, Butler's text had nothing to do with physically picking up the vehicle. *Id.* at 238.

That same day, in response to Butler's text message, McCants called Butler. During that conversation, Butler told McCants that the work had not yet been completed because no one had come to inspect the car. *Id.* at 240. After the conversation, McCants texted his friend, Brian Hairston, and said, "[Butler] is asking if I can send someone else over to take a look at" the vehicle "to tell [Butler] what needs to be fixed." 2 *id.* at 576. Hairston later went to inspect the vehicle and concluded that the work was not completed.

Shortly after Hairston inspected the vehicle, Butler initiated the abandoned-vehicle process by filling out an online form provided by the Virginia Department of Motor Vehicles

("DMV"). Butler filled the form out in his personal name and did not mention the legal or trade name for the repair shop operated by CD & PB Maaco. On October 13, 2017, the DMV sent a letter to McCants's address on file, a Michigan address, notifying him that Butler intended to dispose of the abandoned property and that McCants must reclaim the property by October 31. McCants did not live at the Michigan address and never received this notice. After October 31, Butler posted his intent to auction the vehicle on the DMV website, and after the requisite three-week period, Butler filed for and received title to the vehicle from the DMV. He requested that the certificate of title and registration identify "Butler, Hanson, E." as the "OWNER'S FULL LEGAL NAME . . . OR BUSINESS NAME (if business owned)." *Id.* at 610. As a result, the certificate of title from the DMV vested title in Butler personally and made no mention of CD & PB Maaco. *Id.*; *see also id.* at 908-09.

Though all of Butler's communications with McCants during the ten-month period were either in person, by text, or by phone, Butler never used any of these methods to warn McCants that Butler was seeking to personally acquire the Mustang as abandoned property. Nor did Butler at any time during this period directly or indirectly signal his intent to charge McCants the contractual storage fee for vehicles left at the shop after all repairs had been completed. No such fee was charged, McCants maintained at trial, because the agreed-upon repairs were never completed. Butler conceded that he refrained from charging a storage fee but explained that he was just trying to avoid making McCants "angry." *Id.* at 849.

After receiving the DMV certificate of title to the Mustang, Butler sold it to a co-employee for either $2,000 (according to Butler) or $3,000 (according to the employee). Both Butler and the employee claimed that this payment had been made by check, but neither could

4

provide any record of the transaction. Nor did Butler or the employee introduce into evidence any bill of sale or any other written evidence of the alleged purchase agreement.

After learning in February 2018 that Butler had acquired and then sold the vehicle, McCants initiated this action for conversion, fraud, unjust enrichment, breach of contract, and violation of the Virginia Consumer Protection Act. The trial court held a three-day jury trial at which the jury heard evidence from McCants, Hairston, and Butler, among others. Butler disputed McCants's assertion that the work was incomplete. Butler claimed that he had called McCants twice a day for several weeks, but he provided no record of these phone calls. Butler also claimed that he had withdrawn his consent for the vehicle to be on the property after the September 25 text message to McCants and that he had properly followed the abandoned-vehicle process. Butler argued in a motion in limine and motions to strike that because he had obtained legal title to the vehicle through the abandoned-vehicle process, McCants could not make a claim for conversion. The trial court denied the motion in limine and motions to strike. The court allowed the jury to decide all of McCants's claims and instructed the jury on Virginia's abandoned-vehicle process.

During closing argument, McCants's counsel insisted that "we've heard it repeatedly from all witnesses that at no point was Mr. McCants ever told that the vehicle was being abandoned. Ever. He was never told that." 3 *id.* at 1224-25. Counsel also emphasized that the absence of the post-completion "storage fees" confirms that the work was never completed. *Id.* at 1225. Though Butler claimed that he had "repeatedly called" McCants, counsel added, Butler did not present any phone records to prove this allegation, and McCants testified that the allegation was false. *Id.* at 1230.

Further support for the conversion claim, counsel argued, was the undisputed fact that Butler "re-title[d] the vehicle through the DMV abandon[ment] process to himself" even though the repair "contract for the vehicle and the work to be done was between Mr. McCants and [CD & PB Maaco]" — not Butler. *Id.* at 1252. All of McCants's "fees were paid to [CD & PB Maaco] at the time," *id.* at 1251, not to Butler personally. "Yet the party who initiated the proceeding and received title of the vehicle was Hanson Butler." *Id.* These facts implied, counsel concluded, that Butler wanted the vehicle for himself and wrongfully employed the abandoned-vehicle process to accomplish that end.

The jury found in favor of McCants on the conversion claim only and awarded him $78,500. Butler filed a motion for judgment notwithstanding the verdict, again raising the argument that McCants could not claim conversion because Butler had properly followed the abandoned-vehicle process and had obtained legal title to the vehicle. The trial court denied the motion, and Butler appealed. The Court of Appeals agreed with Butler and reversed the trial court. "[N]o evidence was presented from which a jury could conclude," the Court of Appeals held, that Butler had "failed to follow the requirements of the Virginia Abandoned Vehicle Act." *CB & PB Enters. v. McCants*, 76 Va. App. 407, 415 (2023).[2]

The disputed statutory requirement was whether the Mustang remained "for more than 48 hours on private property without the consent of the property's owner, regardless of whether it was brought onto the private property with the consent of the owner or person in control of the private property." Code § 46.2-1200(2)(ii). In its review of the record, the Court of Appeals

---

[2] The trial court record, notice of appeal, and appellate court briefs state the correct name of the entity as "CD & PB Enterprises, LLC." *See, e.g.*, 1 J.A. at 1, 12; 3 *id.* at 1450. The heading of the Court of Appeals contains a typographical error that erroneously identifies the entity as "CB & PB Enterprises, LLC."

concluded that "[t]he evidence established that Maaco no longer consented to the presence of the Mustang on its property" because "it was evident that Maaco had withdrawn consent by the time of Butler's final text message to McCants . . . to which McCants never responded." *CB & PB Enters.*, 76 Va. App. at 417.[3]  On appeal to us, McCants argues that a rational factfinder could have come to the opposite conclusion and, in this case, did so.  We agree.

## II.

Before evaluating the sufficiency of the evidence, we first summarize the legal framework governing the factfinding task.  McCants sued Butler alleging various theories of legal liability.  The jury found Butler liable only for conversion.  The agreed-upon jury instruction summarized this common-law tort as follows:  "The tort of conversion encompasses a wrongful exercise or assumption of authority over another's goods or chattels [sic], depriving him of their possession; and any act of dominion wrongfully exerted over property in denial of the owner's right, or inconsistent with it."  3 J.A. at 1141.[4]

Under Virginia law, there is no "requirement under the basic conversion cause of action to show intentionality, willfulness, venality, or any other mental state of the defendant." Sinclair, *supra* note 4, § 12-2, at 12-8.  "[W]hen such conversion is proved, the plaintiff is

---

[3] This statement by the Court of Appeals that McCants "never responded," *CB & PB Enters.*, 76 Va. App. at 417, is accurate if it merely suggests that McCants never sent a responsive text message to Butler.  It is inaccurate, however, if it implies that McCants never responded at all to the text.  On the same day that McCants received the text, he called Butler to discuss it.  *See* 1 J.A. at 239-41.

[4] No Virginia statute sets out the elements of conversion.  *See* Kent Sinclair, Sinclair on Virginia Remedies § 12-1, at 12-3 & n.12 (5th ed. 2016).  It is a centuries-old legal claim based upon English common law that was incorporated into Virginia law by the enactment of Code § 1-200 and its predecessor statutes.  *See generally White v. United States*, 300 Va. 269, 277 (2021).  The agreed-upon jury instruction, for purposes of this case, fairly restates the basic principles of conversion.  *See Mackey v. McDannald*, 298 Va. 645, 659 (2020); *Grayson v. Westwood Bldgs. L.P.*, 300 Va. 25, 73 (2021).

entitled to recover, irrespective of good or bad faith, care or negligence, knowledge or ignorance." *Universal C.I.T. Credit Corp. v. Kaplan*, 198 Va. 67, 76 (1956) (citation omitted). The "essence" of the wrongfulness element "is that the defendant has no legitimate claim to the property or recognized legal justification or excuse for taking possession and control of it." Sinclair, *supra* note 4, § 12-2, at 12-8. While "purity of heart" (or lack thereof) may sometimes play a role in the damages calculation, *id.*, the wrongfulness element focuses on an objective evaluation of the factual and legal legitimacy of the defendant's conduct.[5] *See generally* Martin P. Burks, Common Law and Statutory Pleading and Practice § 157, at 265-66 (T. Munford Boyd ed., 4th ed. 1952).

To understand how conversion determines the outcome of this case, we must focus on one of Code § 46.2-1200's definitions of an "[a]bandoned motor vehicle." It includes a vehicle brought onto private property "with the consent" of the property owner but that remains there for more than 48 hours "without the consent" of the property owner. Code § 46.2-1200(2)(ii). This statutory scenario describes a termination of a common-law bailment. "A bailment has been broadly defined as 'the rightful possession of goods by one who is not the owner.'" *K-B Corp. v. Gallagher*, 218 Va. 381, 384 (1977) (citation omitted). A bailment typically begins with "delivery by the bailor and an acceptance by the bailee." *Morris v. Hamilton*, 225 Va. 372, 374 (1983). A bailment ends when it is "dissolved by mutual agreement at any time. It may be terminated by rescission, on adequate grounds, of the bailment contract, as in the case of other

---

[5] We acknowledge that other jurisdictions recognizing conversion liability have adopted "good faith" as a decisional factor consistent with the views of the Restatement (Second) of Torts § 222A(2)(c). We know of no Virginia precedent or legal history supporting this view of conversion as it applies to the initial converter (the first person, after the true owner, who exercises unauthorized dominion and control over the property) as opposed to later innocent bailees or purchasers of the initial converter. That issue is not directly implicated by this case, and thus, we do not address it.

contracts, or it may be terminated by anticipatory repudiation by one of the parties." Sinclair, *supra* note 4, § 7-1[F], at 7-9.

Read in harmony with these common-law principles,[6] the "without the consent" triggering event in Code § 46.2-1200(2)(ii) means any automatic expiration of consent under the terms of the bailment or the proper exercise of the bailee's right, if any, to unilaterally rescind a prior consent. By defining abandonment in this manner, Code § 46.2-1200(2)(ii) provides a statutory basis for answering the "question of intention," *Lindsey v. Clark*, 193 Va. 522, 525 (1952), which we consider to be "a prime factor in determining whether there has been an abandonment," *Hawley v. Commonwealth*, 206 Va. 479, 483 (1965). In this way, Code § 46.2-1200(2)(ii), even with its distinctive 48-hour qualification, adheres closely to the common-law view that "[t]he tort of conversion arises from a bailee's commission of an unauthorized act of dominion over the bailor's property inconsistent with the bailee's rights in that property." Sinclair, *supra* note 4, § 7-1[E], at 7-7; *cf.* Code § 18.2-117 (imposing criminal liability on a bailee who fails to "return" bailed property to the bailor "in accordance with the bailment agreement").

In this case, the "Repair Order," 2 J.A. at 565, created a contractual bailment between McCants and CD & PB Maaco — giving the latter, as bailee, a temporary right of possession of

---

[6] In Virginia, the General Assembly

> is presumed to have known and to have had the common law in mind in the enactment of a statute. The statute must therefore be read along with the provisions of the common law, and the latter will be read into the statute unless it clearly appears from express language or by necessary implication that the purpose of the statute was to change the common law.

*Cherry v. Lawson Realty Corp.*, 295 Va. 369, 376 (2018) (quoting *Wicks v. City of Charlottesville*, 215 Va. 274, 276 (1974)).

the Mustang for the sole purpose of conducting repairs. McCants's theory of liability was that Butler converted the Mustang by wrongfully employing the DMV's abandoned-vehicle process to divest McCants of title and to reassign it to Butler personally. In his defense, Butler claimed that he (as an agent of CD & PB Maaco) expressly canceled the bailment by demanding that McCants remove the Mustang from the CD & PB Maaco shop, and when McCants failed to do so, Butler had a lawful right to treat the vehicle as "abandoned" and to acquire title to it under his own name pursuant to the DMV's abandoned-vehicle process.

The Court of Appeals agreed with Butler, holding that the facts irrefutably proved that he had "withdrawn consent" to keep the Mustang on the Maaco property "by the time of Butler's final text message to McCants." *CB & PB Enters.*, 76 Va. App. at 417. Treating this fact as incontestable, the Court of Appeals held that it necessarily proved that the Mustang had remained "for more than 48 hours" on the property "without the consent of the property's owner" resulting in the total forfeiture of McCants's ownership rights to the vehicle. *Id.* (quoting Code § 46.2-1200(2)). It was thus inconsequential that Butler, not CD & PB Maaco, thereafter acquired title to the Mustang. *Id.* at 417-18.

In our opinion, the evidentiary record does not support the incontestability of Butler's factual claims. During the jury trial, McCants and Butler both testified at length. They presented very different interpretations of their conversations, text messages, and course of conduct. The evidence, viewed in the light most favorable to McCants, reflects the following:

- Both parties agreed that McCants had paid the invoice in full in June 2017 but had inspected the work thereafter and found it unsatisfactory and that Butler had agreed to make it right for no extra charge. 1 J.A. at 221-22; 2 *id.* at 848, 893-96.

- About thirty days later, Butler called McCants to ask McCants to reinspect the vehicle and remind him of what needed to be done. 1 *id.* at 222-23. McCants was out of town and offered to send his friend Hairston to look at the vehicle. *Id.*

10

- McCants and Butler exchanged a series of communications regarding when McCants would be able to inspect the vehicle. *See id.* at 222, 240; 2 *id.* at 570-74.

- Based on Butler's deal-making past with McCants, McCants interpreted Butler's text on September 25 as an effort to find out what kind of discount McCants would accept in exchange for taking the vehicle without any further work. 1 *id.* at 237-39.

- After receiving this text, they had a telephone call in which Butler said that he had not completed any additional work because Hairston had never come to look at the vehicle. *Id.* at 240-41.

- McCants asked Hairston to go look at the vehicle because Butler was "saying that he forgot" what needed to be done and "asking if [McCants] c[ould] send someone else over to take a look at it." 2 *id.* at 576; *see also* 1 *id.* at 249-50.

- Hairston inspected the vehicle thereafter. 1 *id.* at 249-50; 2 *id.* at 917-18.

- Butler conceded that he had never again spoken to McCants about the Mustang after September 25, 2017. 2 *id.* at 859-60; *see also* 1 *id.* at 251-52.

- Butler never explicitly said that he no longer consented to having the Mustang on the property, and he never said that the repairs earlier agreed to had been performed, 1 *id.* at 251; 2 *id.* at 925, 937-38.

- Butler conceded that he had never charged McCants a "storage fee" per the contract although it was CD &PB Maaco's usual practice to charge a storage fee when the work was complete. 2 *id.* at 849, 914-15.

- Butler conceded that he did not in any way "indicate to Mr. McCants that" he was "going to initiate the abandoned vehicle paperwork" or that he was "going to treat [McCants's] vehicle as being abandoned." *Id.* at 922.

- Butler initiated the DMV's abandoned-vehicle process, but the DMV notice went to McCants's parents' home in Michigan. McCants did not live there at the time and never received it. 1 *id.* at 285, 292-94.

- Butler knew McCants was out of town frequently and was tending to his hospitalized mother, *see* 1 *id.* at 223; 2 *id.* at 570-73, 940, but Butler never called, texted, or emailed him regarding the DMV abandoned-vehicle application, 2 *id.* at 922. This was so, despite the fact that Butler and McCants had been communicating about the Mustang by

11

phone and by text messages on several occasions during the 10 months between January and October of 2017.

McCants also presented evidence from Brian Hairston, who had inspected the Mustang to determine what still needed to be done to the vehicle. Hairston testified that he had inspected the Mustang prior to Butler's invocation of the abandoned-vehicle process. Hairston discovered that "the portions of the vehicle that needed to be painted or touched up still hadn't been touched up." *Id.* at 710. Hairston and Butler then engaged (as Hairston characterized it) in a "weird" conversation about whether Butler was "going to paint the entire car over again" or "just the imperfections in the car." *Id.* In Hairston's opinion, the painting of this vintage Mustang "was supposed to have been to the best of their ability," but "it was not." *Id.* at 711. Equally damaging to Butler's credibility is that he allegedly had sold McCants's Mustang to another shop employee but could not produce any documentary evidence of the sale. *Id.* at 908.

We believe that a rational factfinder could have rejected Butler's assertion that he ever actually revoked (whether properly or not) the contractual bailment that authorized the Mustang to remain in the shop until the agreed-upon work was completed. The text message on which Butler relies can fairly be interpreted, as McCants understood it, to be nothing more than an attempt to renegotiate the terms of the repair contract. When McCants refused to capitulate after Hairston's inspection, Butler initiated the DMV's abandoned-vehicle process with the goal of divesting McCants of his ownership of the Mustang and vesting title in Butler personally. Butler started and finished the process without once picking up his phone to call or text McCants, a long-time customer with whom he had been personally communicating about this vehicle for three months.

Butler's use of the DMV's abandoned-vehicle process indirectly corroborated McCants's factual allegations. McCants entered into the repair contract with CD & PB Maaco — not Butler

personally. The Repair Orders identified Butler simply as an "Estimator" for CD & PB Maaco. *Id.* at 564-69.[7]  He was not the contractual bailee of the property. Regardless of whether Butler technically qualified as the proper "person in possession" of the Mustang, *see* Code § 46.2-1202,[8] the jury had ample reason to believe that Butler wrongfully initiated the DMV's abandoned-vehicle process in his own name, misclassified the vehicle as abandoned, and obtained title in his personal capacity.

As we have often said, "[w]hen the law says that it is for the jury to judge of the credibility of a witness, it is not a matter of degree." *Sidya v. World Telecom Exch. Commc'ns, LLC*, 301 Va. 31, 37 (2022) (citation omitted).  "Because the jury's function is to determine the credibility of the witnesses and the weight of the evidence, and to resolve all conflicts in the evidence," *Jenkins v. Pyles*, 269 Va. 383, 388 (2005), we "give the recipient of the verdict the benefit of all substantial conflicts from the evidence and all reasonable inferences which may be drawn from the evidence," *Cohn v. Knowledge Connections, Inc.*, 266 Va. 362, 366 (2003).

These principles are particularly salient in this case.  The jury heard the parties present markedly different interpretations of the same set of text messages, phone conversations, and personal interactions.  The parties also expressed dissimilar views of the quality of workmanship,

---

[7] Butler served as an agent for a disclosed principal, CD & PB Maaco.  The parties do not dispute the vicarious liability of CD & PB Maaco for Butler's conversion of the Mustang.  *See* 3 J.A. at 1125.  The concept of vicarious liability, however, does not convert an agent into an alter ego of the principal.  In simpler terms, an agent can bind the principal but cannot impersonate him.  *See, e.g.*, Restatement (Third) of Agency § 6.01 cmt. b ("An agent who enters into a contract on behalf of a disclosed principal does not become a party to the contract . . . unless the agent and the third party so agree.").  In this case, the evidence supports the inference that Butler pursued the entire abandoned-vehicle process, from beginning to end, in his personal capacity.

[8] Butler argues on appeal that anyone in physical possession of what appears to be abandoned property may initiate the statutory DMV process to obtain title to the property.  *See* Oral Argument Audio at 12:32 to 13:55, 16:02 to 17:14, 25:40 to 27:14.  Given our holding, we find it unnecessary in this case to define with precision the proper party with standing to initiate the DMV's abandoned-vehicle process.

the need for additional repairs, and the timeline for the work. Viewing the evidence in the light most favorable to McCants, the only question we ask is whether a rational jury could have found by a preponderance of the evidence that Butler converted the Mustang by wrongfully using the DMV's abandoned-vehicle process as a pretext for severing McCants's ownership rights in the vehicle and thereafter claiming it for himself. Because a rational jury could and did so find, its verdict cannot be set aside as "plainly wrong or without evidence to support it." Code § 8.01-680.

III.

In sum, the Court of Appeals erred in reversing the trial court's order confirming the jury verdict in favor of McCants's conversion claim. We reverse the judgment of the Court of Appeals, reinstate the verdict, and affirm the trial court's confirmation order.

*Reversed and final judgment.*

14